**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

                    **Plaintiff,**

                                                            **21-CR-50V**

 **v.**

**LARRY WATKINS, JR.,**

                    **Defendant.**

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Lawrence J.

Vilardo, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and

report upon dispositive motions.

## PRELIMINARY STATEMENT

        The defendant, Larry Watkins, Jr. ("the defendant"), has filed a motion

wherein he seeks suppression of the use of evidence "obtained following his

warrantless arrest and subsequent illegal searches and custodial interrogation that

followed pursuant to the Fourth Amendment."   He also seeks "to suppress and exclude

evidence obtained during an illegal custodial interrogation pursuant to the Fifth

Amendment and *Miranda* and *Seibert*."   Dkt. #16.   The government has filed its

opposition to the motion.   Because there were factual issues that needed to be

resolved in order to rule on the motions of the defendant, an evidentiary hearing on the issues was conducted by this Court on August 17, 2021 and a transcript of the proceedings was filed on October 19, 2021.   Dkt. #28.   Post-hearing memoranda were filed by the defendant and the government on November 29, 2021.   Dkt. #s 34, 33, respectively.   Thereafter, the parties asked that the matter be held in abeyance while they conducted plea negotiations.   This Court was advised on February 22, 2022 that plea negotiations were no longer being conducted, and the defendant asked this Court "for a decision on his" pending motions.   Dkt. #38.

## **FACTS**[1]

The defendant had been convicted of violating Title 18 U.S.C. §§ 922(g)(1) and 924(a)(2) by reason of his plea of guilty to Count 1 of the indictment that had been returned against him.   As a result of that plea, the defendant was sentenced to a term of 27 months incarceration and a term of 3 years of supervised release following his release from incarceration.   *See* 18-CR-131, Dkt. #78.   The defendant completed his period of incarceration and was released on supervised release subject to the terms of supervised release that had been imposed in his sentence.   *See* 18-CR-131, Dkt. #79.

---

[1] The facts are taken from the transcript of the evidentiary hearing conducted on August 17, 2021/   Dkt. #28. Reference to the transcript is designated as "T" followed by the appropriate page number(s).   Some of the facts are also taken from the filings in 18-CR-131 and in this case.

On March 2, 2021 the defendant was on supervised release and subject to the terms of supervision that had been imposed on him.   Special Agent Robert Grunder of the ATF testified that prior to March 2, 2021, information had been received that the defendant "was in possession of two guns."   T. 8, 17, 2.   U.S. Probation Officer ("P.O.") Calero called him and asked Special Agent Grunder "to assist U.S. Probation with the search" of defendant's residence at 126 Stanton Street, Buffalo, New York.   T. 10, 56.   P.O. Calero advised him that the defendant "was convicted of a felony of a felon in possession of ammunition."   T. 10, 34-35, 55.   U.S. Probation (sic) also advised him that they had "information that [the defendant] was in "possession of two guns."   T. 10-11, 35-36, 54, 58.

On March 2, 2021, a number of probation officers and police and Special Agent Grunder went to the defendant's residence at 126 Stanton Street for purposes of conducting a search of the premises by probation officers.   Special Agent Grunder attended at the request of the probation officers.   T. 11, 34.   Initially the probation officers, with the assistance of Buffalo Police, entered the defendant's residence for purposes of doing a safety sweep.   T. 11.   After the safety sweep was completed and the "all clear" signal given, Special Agent Grunder entered the residence of the defendant and observed the defendant "seated in the kitchen at a kitchen table" and he was handcuffed.   T. 12, 36, 38.   He also observed the defendant's wife "and maybe his grandson."   The probation officers and other law enforcement personnel began searching the residence of the defendant while he remained handcuffed.   Special

Agent Grunder assisted "a little bit in the search," more specifically by assisting in the search with others in a "work trailer" that was outside of the residence.   T. 13-14.   At some point in time prior to a weapon being found, Special Grunder spoke to the defendant briefly about "what [the defendant] did for work."   T. 15-16, 60.   Thereafter, someone "from U.S. Probation informed [him]" that a gun had been found in a bag containing clothing" somewhere "in the bedroom."   T. 17-18, 56-57, 59, 64.   Special Agent Grunder saw the gun, which was a handgun, black in color.   After looking at the weapon, he informed the defendant "that they just found a firearm, they just found a gun," and he asked him "whose gun it was."   T. 18-20, 61-62.   The defendant responded that "it was his."   Special Agent Grunder asked him where he got the gun and the defendant stated that "he got it at his daughter's house."   T. 20, 62, 79.   This conversation with the defendant lasted approximately "30 seconds, maybe a minute" and was conducted for the purpose of "trying to find out where [the defendant] got the gun from and where the second gun was."   T. 21-22, 63, 65.   The defendant had not been given any *Miranda* warnings at this time.   T. 22, 62, 93.   Special Agent Grunder admitted on cross examination that the defendant was in custody at this time and that he should have given *Miranda* warnings to him.   T. 69.   Ultimately the defendant was removed from the premises and transported by "one of the Marshals" to a McDonald's parking lot "located on the corner of William and Jefferson in Buffalo, New York" where an interview of the defendant was conducted by Special Agent Grunder at the request of others.   T. 24.   Special Agent Grunder was "not comfortable" with interviewing the defendant further at the residence because of all of the different people present there.

T. 25, 91.   The interview of the defendant in the McDonald's parking lot was conducted in the vehicle driven by Deputy Marshal Brezza by Special Agent Grunder while Deputy Marshal Brezza recorded it.[2]   T. 76.   Before questioning the defendant, Special Agent Grunder read the *Miranda* warnings and advice of rights to the defendant from his *Miranda* card (Government Exhibit 1) and the defendant responded "that he understood the questions that [Special Agent Grunder] was asking him and that he was willing to speak to [him]."   T. 25-26, 28-29.   Special Agent Grunder believed that the defendant had validly waived his rights after being given the *Miranda* warnings.   T. 77.   It was the "intent" of Special Agent Grunder to get more information about the second firearm and who's providing the firearms to [the defendant]."   T. 33, 88.   The questions presented by Special Agent Grunder to the defendant in this second interview in the vehicle "were more detailed and more focused than the first one" that had been conducted at the defendant's residence.   However, he started the interrogation by once again telling the defendant that they found a handgun in his room just like he started the interview with the defendant back at his residence.   T. 77, 79, Government Exhibit 2.   He asked if the defendant had ever shot the gun that was recovered and if there were "any other investigations out there that [he] should be aware of in terms of homicides or shell casings that may be associated with that firearm."   T. 34.   The interview of the defendant in the vehicle lasted 17.01 minutes and approximately 15 minutes of that interview were questions put to the defendant about the handgun that had just been found in his bedroom.   T. 76-77, 89-90, Government Exhibit 3.   Near the end of the

---

[2] A transcript of the recorded interview was made and submitted as Government Exhibit 2.   T. 29-30.

interrogation of the defendant, Special Agent Grunder asks only four (4) questions about other firearms.   T. 98, Government Exhibit 2, p. 18, ff. 12-19.   According to Special Agent Grunder, he "guessed" that "about an hour" elapsed between the time he first interviewed the defendant in his kitchen and when he interrogated him in the vehicle.   T. 93.

## DISCUSSION AND ANALYSIS

### A.  The Defendant's Claimed Fourth Amendment Violation

It is undisputed that when the U.S. Probation Officers ("USPOs") entered the defendant's residence along with a number of law enforcement officers, they did not have a search warrant for his residence at 126 Stanton Street; nor did they have a warrant for his arrest.   However, it is also undisputed that on March 2, 2021, the defendant was a convicted felon on supervised release and subject to supervision by USPOs.

The defendant argues that the USPOs "did not possess probable cause (or direct evidence) that [the defendant] committed a felony – they did not possess probable cause to believe this and effect a lawful arrest until **after** the firearm was found in the house."   Dkt. #16-1, p. 7.   Therefore, defendant's Fourth Amendment rights

were violated, and the evidence seized as a result of that violation "should be excluded from evidence as 'fruits of the poisonous tree."   Dkt. #16-1, p. 7.

The defendant also argues that the "tip" received by the USPO was "unverified" from a "confidential informant" and therefore that information "fell short of the quantum of evidence needed to meet the 'reasonable suspicion' standard and justify the warrantless search of [the defendant's] residence"   Dkt. #16-1, p. 11.

For the reasons that follow, the arguments of the defendant are rejected as being without legal merit.

The Second Circuit Court of Appeals has expressly ruled on the issue of supervised release of a defendant and the diminishment of Fourth Amendment rights while on such supervised release in *United States v. Reyes*, 283 F.3d 446 (2d Cir. 2002) wherein the court held:

>     1.    The United States Probation Office functions as a legally constituted arm of the judicial branch, with federal probation officers serving both as confidential advisors to, and officers of, the United States District Court.   *See United States v. Inserra*, 34 F.3d 83, 88 (2d Cir. 1994); *see also* 18 U.S.C. § 3602(a).
>
>     2.    Federal probation officers overseeing convicted persons serving terms of federal supervised release are charged with monitoring a supervisee's adherence to the conditions of his release, *see* 18 U.S.C. §§ 3603(2), (4), which includes the requirement that the supervisee not commit further crimes, 18 U.S.C. § 3583(d); U.S.S.G. §

5D1.3(a)(1).

3.    A United States probation officer conducting a court-imposed *home visit* of a convicted person serving a term of federal supervised release is not subject to the probable cause requirements of the Fourth Amendment that would ordinarily apply to law enforcement officers executing a search warrant for an individual's home, *Griffin v. Wisconsin*, 483 U.S. 868, 878, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), or subject to the reasonable suspicion standard applicable to *probation searches* under *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).

4.    A convicted person serving a term of federal supervised release has a severely diminished expectation of privacy, making it reasonable and lawful for probation officers to walk on the supervisee's driveway during a required home visit and observe what they may in plain view.

5.    While a probation officer legally may seize contraband observed in plain view during a home visit, the probation officer may also consign his seizure authority to other law enforcement officers at the scene by notifying them of the discovery.

6.    The so-called "stalking horse" theory does not exist as a matter of law, since the objectives and duties of probation officers and law enforcement personnel are often parallel and frequently intertwined.   Accordingly, the law permits cooperation between probation officers and other law enforcement officials so that they may work together and share information to achieve their objectives.

*Id.* at 470-471; *see also United States v. Braggs*, 5 F. 4th 183 (2d Cir. 2021).

It is further pointed out that in its decision in *Samson v. California*, 547 U.S. 843, 850 (2006), the Supreme Court cites *United States v. Reyes, supra* with approval in holding that a suspicionless search of a parolee does not violate the Fourth Amendment to the United States Constitution.

8

Since the USPOs' visit to and search of the defendant's residence at 126 Stanton Street, Buffalo, New York were undertaken as part of their duties of supervision over the defendant who was on supervised release, their actions were constitutionally permissible.   *Braggs, supra; United States v. Grimes*, 225 F.3d 254, 259, m. 4 (2d Cir. 2000).   Once the USPO received notice of an anonymous tip advising that the defendant possessed two guns, a clear violation of his supervised release conditions, they were obligated to carry out the duties of supervision of the defendant by investigating the matter to determine whether the defendant was complying with his conditions of supervised release.   *United States v. Barner*, 666 F.3d 79, 85 (2d Cir. 2012).   The fact that Special Agent Grunder of the ATF accompanied the USPOS in this endeavor was justified or permitted and therefore his actions were not violative of the defendant's Fourth Amendment rights. *Reyes, supra*.   Therefore, it is recommended that the defendant's motion to suppress the use of evidence seized from his residence on March 2, 2021 be denied in all respects.

### B.  The Defendant's Statement Given at 126 Stanton Street

The defendant asserts that the interrogation of the defendant at 126 Stanton Street by Special Agent Grunder was in violation of *Miranda* because he was in custody at the time and Special Agent Grunder failed to give him the *Miranda* warnings and advice of rights prior to the questioning.   Dkt. #34, pp. 7-14.

9

In *Miranda*, the United States Supreme Court created a procedural mechanism with the purpose of establishing a prophylactic safeguard that would protect a defendant from the coercive nature of custodial interrogation and preserve his Fifth Amendment privilege against self-incrimination.   However, before the requirements of *Miranda* come into play, there must be a form of "custody" of the person to be interrogated which "custody" amounts to the deprivation of "freedom of action in any significant way."   *Miranda v.* Arizona, 384 U.S. 436, 444 (1966); *Thompson v. Keohane*, 516 U.S. 99, 100-101 (1995); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004).   The defendant bears the burden of proving custody.   *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984).   In making a determination of whether such "custody" existed, the Court must consider the totality of the circumstances.   *California v. Beheler*, 463 U.S. 1131, 1125 (1983); *Tankleff v. Senkowski, supra*.   "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."   (Citation omitted).   *California v. Beheler* at 1125; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).   The United States Supreme Court has "explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'."   *California v. Beheler* at 1125; *Mathiason* at 495. See also: Illinois v. Perkins, 496 U.S. 292, 296-297 (1990).

"[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."   *United States v. Newton, supra* at 675; *United States v Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992).

The Court of Appeals for the Second Circuit has ruled that:

> The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.   An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.   *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir.) (internal quotation marks and citation omitted, *cert. denied*, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *see also United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

*Tankleff v. Senkowski* at 243-244.

As the Court of Appeals for the Second Circuit has stated, the Supreme Court's decision in *Berkemer* "emphasizes that 'the only relevant inquiry [in determining when a person is in "custody" for purposes of Miranda] is how a reasonable man in the suspect's position would have understood his situation'."   *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir. 2001).

11

> It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation.   We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent.

*Illinois v. Perkins*, 49 296-297 (1990) .

On March 2, 2021, the defendant's residence was invaded by a large number of law enforcement officers including USPOs and Special Agent Grunder and their entry into the residence was made without a search warrant.   When the defendant was found in the residence, he was immediately handcuffed and placed in a chair in the kitchen while officers proceeded to conduct a search of his residence   T. 12, 36, 38.  While this search was taking place, Special Agent Grunder engaged in a conversation with the defendant about "what [the defendant] did for work."   T. 15-16, 60.   However, when the weapon was found in a bedroom, Special Agent Grunder viewed it and then told the defendant "that they just found a gun" and he asked him "whose gun it was." T. 18-20, 61-62.   At this point in time, the question to be answered is whether it was reasonable for the defendant to believe that he was "subjected to restraints comparable to those associated with a formal arrest."   *Tankleff, supra* at 243.   It is this Court's finding that the defendant was so restrained since he had already been convicted of violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and knew that possession of a weapon was not only a violation of his supervised release but also was prohibited by reason of his prior convictions.

12

As a federally convicted felon on a gun charge, the defendant was obviously experienced in some degree with the criminal justice system and the concept of being arrested or in law enforcement custody.   Having just witnessed a number of law enforcement officials in his home conducting a search and finding a weapon, it was reasonable for the defendant, still in handcuffs, to now believe he was under arrest when Special Agent Grunder asked him this question.   In fact, Special Agent Grunder testified that he considered the defendant to be in custody and that he should have given *Miranda* warnings at that time as evidenced by the following cross examination of Special Agent Grunder:

> Q.   And you understand the law that requires you to give *Miranda* warnings prior to questioning when a suspect is in custody, correct?
>
> A.   Yes.

T. 68, ff. 18-21.

> Q.   And you would agree with me that inside of the kitchen, or inside of 126 Stanton in general, you had the opportunity, if you wanted to, to provide Mr. Watkins his *Miranda* warnings, correct?
>
> A.   Correct.

T. 65-66, ff. 22-25, 1

> Q.   So, based on all your training and experience, what you saw that morning, you would agree Mr. Watkins was in custody and you should have Mirandized him prior to questioning him, correct?

13

A.   Correct.

T. 69, ff. 7-11.


When Special Agent Grunder was questioned on redirect examination, the following was established:


Q.   On cross-examination you stated to Mr. Singer that you should have Mirandized the defendant, do you recall that?

A.   Yes.

Q.   Were you referring to the time that the defendant was in the kitchen or at the time he was in a vehicle?

A.   Referring to in the kitchen.

T. 93, ff. 4-9.


Although the defendant did not testify at the evidentiary hearing of August 17, 2021, he presented Defendant's Exhibits G and H which were received in evidence with no objection from the government.   T. 98.   Defendant's Exhibit G is an affidavit of the defendant sworn to May 21, 2021.   Defendant's Exhibit H is an affidavit of the defendant's wife sworn to May 24, 2021.   In ¶ 4 of the defendant's affidavit, he states that he was told by a male probation officer that he was "under arrest" and that his wife asked this probation officer what the defendant was "under arrest for."   In ¶ 4 of the defendant's wife's affidavit, she states that a male probation officer "grabbed [the defendant] and told him that he 'was under arrest.'"   She further states in ¶ 5 of her

14

affidavit that the defendant was "in handcuffs surrounded by several officers" and that
he "was not given the option to leave the house like [she] and [her] son" were.

The United States Supreme Court has stated that "at a suppression
hearing, the court may rely on hearsay and other evidence, even though that evidence
would not be admissible at trial."   *United States v. Raddatz*, 447 U.S. 667, 679 (1980);
*United States v. Matlock*, 415 U.S. 164, 172-174 (1974).

When considering all of the circumstances in their totality that occurred on
March 2, 2021 at 126 Stanton Street in the questioning of the defendant by Special
Agent Grunder, I find that the defendant was in custody at the time and that *Miranda*
warnings and an advice of rights should have been given to the defendant before
Special Agent Grunder started questioning him about the gun.   Since *Miranda* was not
complied with, I recommend that the statements made by the defendant to Special
Agent Grunder while in the kitchen at 126 Stanton Street be suppressed as evidence at
the trial by the defendant.

**C. Defendant's Claim that there was a "Two Step" Interrogation
Conducted by Special Agent Grunder that "Warrants
Suppression" of the Defendant's Statements Made After Being
Given *Miranda* Warnings**

The defendant argues that the rule established in *Missouri v. Seibert*, 542
U.S. 600 (2004) was violated because Special Agent Grunder conducted a "two step"

15

interrogation of the defendant.    Dkt. #34, pp. 14, 16.

Admittedly, the defendant presents a meritorious argument for
suppression of his statements, but for the reasons that follow, it legally fails to warrant
suppression.    The facts in support of the defendant's argument are the following:

1.  The defendant was immediately placed in handcuffs when the multiple
    law enforcement officers entered his residence.

2.  While handcuffed, the defendant was subjected to questioning by
    Special Agent Grunder without being given *Miranda* warnings or advice
    of rights.

3.  Special Agent Grunder was a sixteen-year experienced ATF agent and
    admitted on cross-examination that he considered the defendant to be
    in custody when he asked the incriminating questions of the defendant
    and admitted that he should have first given *Miranda* warnings to the
    defendant.    T. 69.

4.  When the defendant was interviewed a second time, it was by the
    same agent, to wit, Special Agent Grunder.    After reciting the *Miranda*
    warnings and advice of rights to the defendant from his *Miranda* card,
    Special Agent Grunder started the interrogation in the same way that

16

he started the first interrogation, *i.e.*, by telling the defendant that they

found a handgun in his bedroom, and his continued questioning

elicited the same answers from the defendant that he had given in the

first interrogation in his kitchen while handcuffed.   T. 77-79,

Government Exhibit 2, p. 3, ff. 4-9.

5.   The lapse of time between the first interrogation of the defendant and

the second interrogation of the defendant by Special Agent Grunder

was approximately one hour as "guessed" by Special Agent Grunder.

T. 93.

6.   The second interrogation of the defendant in the vehicle with Special

Agent Grunder lasted 17.01 minutes and approximately 15 minutes of

that time related to questions by Special Agent Grunder about the gun

found in the defendant's residence.   T. 76-77, 89-90, Government

Exhibit 3.   It was only at the end of the interrogation that Special Agent

Grunder asked the defendant about other firearms, and that was

limited to just four questions.   T. 98, Government Exhibit 2, p. 18, ff.

12-19.

7.   No curative measures were taken by Special Agent Grunder as part of

the *Miranda* warnings given to the defendant at the start of the second

interrogation, *i.e.*, "an additional warning that explains the likely inadmissibility of the prewarning custodial statement."  *Seibert, supra* at 622.

However, the factual circumstances in *Seibert* are substantially different from the case at bar.   In *Seibert* the officer admitted that he "made a 'conscious decision' to withhold *Miranda* warnings by resorting to an interrogation technique that he had been taught:   question first, then give the warnings, and then repeat the question" in order to obtain the same admissions made in the first interrogation.   *Id*. at 606.   As a result, the Supreme Court found that this evidence "reveal[ed] a police strategy adapted to undermine the *Miranda* warnings.   *Id.* at 616.

In the present case, I find that the evidence presented at the hearing on August 17, 2021 satisfies this Court that the initial questioning of the defendant by Special Agent Grunder in the kitchen of the defendant was not part of a "deliberate" attempt to withhold *Miranda* warnings notwithstanding Special Agent Grunder's testimony that he considered the defendant to be in custody at the time and that he should have given *Miranda* warnings to him at the time.   T. 69.   Special Agent Grunder testified that the interrogation of the defendant in his kitchen lasted approximately thirty seconds to a minute.   T. 63.   He also testified that he questioned the defendant at this time for the purpose of "trying to find out where [the defendant] got the gun from and where the second gun was."   T. 21-22, 63, 65.   It is not unreasonable to believe that Special Agent Grunder was concerned about the safety of the officers in the residence

18

and the possible presence of a second weapon.    Even though the defendant was handcuffed, the defendant's wife and perhaps his grandson were in the premises as well and therefore the elimination of a threat of a second weapon was a reasonable objective for Special Agent Grunder to pursue at that time.    *See United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003); *United States v. Newton*, 369 F.3d 659, 677-678 (2d Cir. 2004); *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005); *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011); *United States v. Williams*, 681 F.3d 35 (2d Cir. 2012).

Because Special Agent Grunder was "not comfortable" with interviewing the defendant further at the residence because of all the different people present there, he was taken to the McDonald's parking lot, a short distance from his residence, where Special Agent Grunder conducted the second interrogation after giving him *Miranda* warnings and advice of rights which the defendant acknowledged he understood and that he was willing to speak [to Grunder]."    T. 25-26, 28-29.    Special Agent Grunder believed that the defendant had validly waived his rights after being given *Miranda* warnings and advice of rights.    T. 77.

Having observed the demeanor of Special Agent Grunder during his testimony and hearing his answers to the questions put to him, I find Special Agent Grunder to be a credible witness and accept his testimony.

Because the first interrogation of the defendant was not a "deliberate" attempt to circumvent *Miranda* by conducting a second interrogation, commonly referred to as a "two step interrogation," I find that the holding in *Seibert* is not applicable to the facts in this case and that the issue is subject to the U.S. Supreme Court's analysis set forth in *Oregon v. Elstad*, 470 U.S. 298 (1985).   In making that analysis, this Court has "examin[ed] the surrounding circumstances and the entire course of police conduct in their totality with respect to the [defendant] in evaluating the voluntariness of his statements.   The fact that [the defendant] cho[se] to speak after being informed of his rights is, of course, highly probative." *Id*. at 318.   As the Court of Appeals for the Second Circuit has stated, "[in] the Fifth Amendment context, the exclusionary rule is designed to assure the trustworthiness of evidence."   *United States v. Morales*, 788 F.2d 883, 886 (2d Cir. 1986).

As previously stated, the defendant is a convicted federal felon and therefore, as such, had experience with the criminal justice system and his rights under the Constitution and federal law.   He was by no means ignorant of those rights having been subjected to a Federal Rule of Criminal Procedure colloquy pursuant to Rule 11 at the time he entered a plea of guilty to having violated Title 18 U.S.C. §§ 922(g)(1) and 924(a)(2) in 2019.   *See* 18-CR-131, Dkt. #71.   The first interview of the defendant by Special Agent Grunder only lasted thirty seconds to a minute after a weapon was found in the defendant's bedroom.   The questions put to the defendant by Special Agent Grunder in the kitchen of the defendant did not constitute aggressive or :coercive police

20

tactics or methods offensive to due process."   As the court stated in *Elstad*, "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary."   *Elstad* at 318.   Even though the defendant responded to unwarned yet uncoercive questioning, he was not "disabled from waiving his rights and confessing after he [had] been given the requisite *Miranda* warnings."   *Id*. at 318.   As the Court of Appeals for the Second Circuit has held, "*Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the post warning confession."   *United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007), *cert. denied by Bearam v. United States*, 128 S.Ct. 1066 (2008).   I find, based on the evidence presented at the hearing, that the second interrogation of the defendant conducted by Special Agent Grunder was not part of a "deliberate two step interrogation" in order to circumvent *Miranda*, and that the defendant did voluntarily waive his rights after having been given *Miranda* warnings and advice of rights by the agent.   *See* Government Exhibit 2, pp. 2-3.

"[T]he dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement [of the defendant] in the case in chief.   No further purpose is served by imputing 'taint' to [the] subsequent statements [of the defendant] obtained pursuant to a voluntary and knowing waiver."   *Elstad, supra* at 318.   Therefore, it is hereby recommended that the defendant's motion seeking suppression of the use of the defendant's statements given after having received

*Miranda* warnings and advice of rights be denied.

It is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.   *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**   *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

DATED:      Buffalo, New York
            March 24, 2022

_S/ H. Kenneth Schroeder, Jr._
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

23